Thank you. And I'm here on behalf of Richard and Mary Lou Stengel. We're here appealing a dismissal of our complaint on the grounds that it was federally preempted, and a denial of our request to allow us to amend the complaint, and also a denial of our request to allow us to do some discovery before having to respond. Of course, the whole thing boils down to the meaning of regal, right? Well, the meaning of regal or the meaning of what the PMA really does. Our argument, of course, is that regal certainly requires or forbids states from having additional requirements. Different from or in addition to the federal ones that relate to safety and effectiveness. Absolutely. That's the standard. That is the standard. But the PMA approval puts certain requirements on a manufacturer, and some of those requirements are set forth, including requirements to continue to advise the FDA about problems, for instance, problems when there are adverse events, problems when there is medical literature talking about adverse events, and other information that comes to the attention of the manufacturer. And the question is, when you have events that happen after there has been PMA approval, or premarket approval, I guess is redundant, what does the manufacturer have to do? Is it free to violate its requirements under the FDCA? And if it does violate those requirements, can those violations remove the requirement of the FDA to continue to advise the FDA about problems? And I understand that puts us firmly into Buckman preemption. And the question is, what about Buckman preemption? We don't want plaintiffs' attorneys burdening the FDA. I understand that that's what the Supreme Court said. We don't want them taking the depositions of the FDA folks. We don't want them second-guessing what the FDA folks did. But what about the situation where, prior to the lawsuit, the FDA discovers violations on the part of the manufacturer? What about the situation where the FDA discerns that those violations actually require additional actions on the part of the manufacturer, and what about the situation where those additional actions, which are required by the FDA, come too late? To prevent the injury to the plaintiff, but would not have come too late if the manufacturer had met its obligations under the FDCA. Well, the real, the real, as I see it, the real struggle here is whether State law gets involved. I mean, there's no question that, to the degree the FDA has a claim and you don't do what the FDA says, you've got problems with the FDA under federal law. But the Supreme Court, as I read Regal, seems to be really, really clear that what Congress had in mind with respect to these devices and so on is it doesn't want, with rare exceptions, for people to be able to go to State courts and bring all kinds of disparate claims in 50 different States about matters that Congress feels should be uniformly regulated and controlled by the FDA. And so, as I see it, your burden here is to show that you fit into one of those microcosmic small exceptions that comes out after Regal. And I'm struggling with how you meet that burden here. I'm hoping you can help me. Well, the case I would rely on, and we called it to the Court's attention in our 28J letter, and I only really rely on it primarily because of the analogous facts, is the Hughes v. Boston Scientific. And what happens there, as I understand from the opinion, is there's something called an HTA, which is a hydrothermal ablation machine. It sounds like they use hot water to maybe stop bleeding. And the application of that machine seems to result in a bunch of burns. And the bunch of burns get reported to the manufacturer, and the manufacturer fails to pass on the information to the FDA. And the Fifth Circuit determines that that claim for failure to warn can, in fact, go forward and is not federally preempted. And you need to think about the reasoning. Because if you're going to federally preempt a claim where the manufacturer violates its obligations under the statute, then the manufacturer can simply withhold information. Let's get to your particular case. Okay. As I understand it. I'm unaware of any evidence of Federal violations during the time before your client's complications. Do I misunderstand? Yeah. No, I think you do misunderstand. Okay. Although we were deprived of discovery, and so I'm going to have to do this based on the warning letters, which we appended to the motion to amend the complaint. And I'd call the Court's attention to the Gerber case cited, actually, by Medtronic, because there's a nice long discussion about why you should allow discovery since all of these premarket approval documents are confidential and the plaintiffs are really handicapped in developing a record to justify why their case can go forward. And we were deprived of that opportunity. But if you look at the warning letter, what it says is Mr. Stengel developed his granuloma in 2005. In somewhere around 2001 from the warning letters, we know this, Medtronic's had information about 41 or so granulomas, which is some kind of soft tissue mass that forms in the spinal cord and compresses the spine. And you need to know that what we're complaining about is not that they sell these pumps. We're complaining about that they don't tell the doctors if you have a patient with one of these pumps and suddenly they develop sudden onset neurological symptoms, you have to do a test with contrast rather than not with contrast. Because not with contrast is not going to see the soft tissue mass. And what happens in Mr. Stengel's case is he collapses, goes to the ER. There's a neurosurgical consult with a guy named Arlo Brakel, who's the neurosurgeon on call, who has never heard that these pumps can cause this type of mass. And so he orders a CT without contrast. And so there's no determination that Mr. Stengel has this mass. He's in the hospital for about four days with signs of paraplegia. When he's seen by a colleague of Dr. Brakel's named Dr. Sannon, who actually — Forgive me one second. I'm familiar with what you're talking about here, but I have raised a question before about evidence of problems — Sure. — of Federal violations before this happened to your client. And you said there were, but I'm waiting to hear — And I'm going to get back to that. I just wanted to set the context a little bit. Okay. Sure. And maybe — You know what happened to your client. It's in the briefs. Okay. All right. The warning letter indicates that in 2001 there was information developed by Medtronics because they had 41 or so of these prior granulomas. And that in 2003, that they actually created something called an educational brief with an additional 51 granulomas and did, in fact, not send that material to the FDA. And the FDA determined in 2008 when it did its audit and warning letter, you know, that was a reportable correction back in 2003. You needed to tell us about that. And did the FDA take any action to punish them for failure to do that? Well, they took action saying, you need to fix this problem. And the consequence was that Medtronics developed an additional dear doctor letter that basically sent out information saying, if you have a patient with this, you need to do a CT with contrast. This fits within the pattern of Regal where the Federal agency charged with administering this law found out about these 41 or whatever number of these events occurred. It chastised Medtronics. As a result, Medtronics sent out a letter informing users about the problem. Now, that's all under Federal law. How does the State law get involved in this? Well, Your Honor, my understanding is if Arizona, for instance, had said we're going to pass a law that you can bring a cause of action for violation of a FDCA violation, then there would be a Federal or there would be a State cause of action based on a Federal violation. Arizona, however, has common law negligence and statutory strict products liability. And as a consequence, it has adopted a common law rule that you have to do post-sale warnings where reasonably necessary. But isn't that exactly what Regal talked about? Sure. And I think that in this particular situation where you have the situation where Medtronics came in and apparently, at least if you read the FDA warning letter, there's a fair inference of this since we were denied discovery, violated its obligations under the PMA, those violations, the question is, how does that affect preemption? And I think that this is different. This is different than the Regal case. And I would point you to that. Well, that's where Buckman comes in, right? It's where Buckman comes in. And Buckman, and actually, I think, or Buckman, rather, has been waiting for this case, because Justice Stevens says. We were just thinking that. Yeah. Justice Stevens says this would be a different case. Yeah, well, that's the you cite the concurrence. Yeah. I do, Your Honor. Which is only their words. The instant concurrence was Stevens and someone that rarely agrees with him. But a concurrence doesn't help very much. The majority didn't agree. Well, Your Honor, I think a concurrence, I think that the test wasn't, or the case wasn't presented to them because we didn't have that fact pattern in Buckman. Right. They were going off the track and they didn't get another three votes. So I don't see what benefit former Justice Stevens' comments are to you. He was simply saying the logic of the rule in Buckman would not apply if prior to the lawsuit the FDA itself had found violations and I understand. I write some dissents and some concurrences. But they don't stand for anything other than my view. And they're brilliant. Well, I'm certain they're great, but the logic of the argument is what we're really calling to the Court's attention. Do you mean that we could cite that concurrence to make a decision in this case? I think you're going to have to make a decision in this case, and there is no decision on these facts that bind the Court. And Justice Stevens' concurrence accurately sets forth the logic of our position, which is you don't want to immunize bad conduct. And the question is, if you are no longer concerned with the issue of burdening the FDA because the FDA has already acted, so you no longer really have to worry about Buckman preemption, then what do you do about the situation where a manufacturer had PMA approval but subsequently learned of things that the FDA thinks, and we know what it thinks when it finds out, should be called to the attention of doctors in the community, and they weren't because the manufacturer didn't call them to the attention of the FDA? But it's still, Judge Wallace has put it absolutely, in my view, 100 percent right on the money. We, whether Justice Stevens agreed with the logic of what you're saying, we nonetheless have nothing from the Supreme Court that tells us what to do here. We do, however, have Regal. We do have Buckman. And those suggest that the blessing of a 50-state varied scheme to go after manufacturers of medical devices is exactly the opposite of what Congress intended and is not where we ought to go. Where am I missing something here? Well, Your Honor, with all due respect, I think that Your Honor's analysis misses the point that that question has not been presented to the Supreme Court of what happens when the FDA, prior to the lawsuit, actually finds buyers. But you do agree that Stevens' concurrence has not in any way controlling it. It doesn't bind. The reasoning may be something that you believe we should follow, but we are in no way bound by it. I do agree with that, Your Honor. And that's why I refer Hughes v. Boston Scientific, where the Fifth Circuit just this prior year, 2011, went that way. There is no ---- You would want us to follow the Fifth Circuit, but what about the Eighth and the Sixth? You don't care for their approach. Well, Your Honor, what I would advance for the Court is what's the logic of it? Well, I'm sort of ---- let me confess something, because you don't have much time. In reading those decisions, I think the Eighth Circuit has better logic and direction. Now, tell me why the approach of the Fifth Circuit is better than the Eighth Circuit. I'd like your view on that. Well, I start with the proposition that depriving someone of a cause of action is a serious deprivation, and that you only want to do that when absolutely necessary to advance the Federal issues involved. We have Regal, which says the manufacturer needs to be satisfied that if it gets PMA approval, it can't be subject to different State concerns. But it also adopts or accepts the obligations under the PMA of doing continuing reporting. And then you have Buckman, which says we don't want to burden the FDA, which doesn't apply when the FDA is already active. When you have those two facts, the deprivation of the plaintiff's cause of action is too serious to countenance without countervailing Federal benefit. Okay. Thank you very much. Let's hear from Mr. Brown on behalf of Medtronic. Good morning, Your Honors. Michael Brown on behalf of the defendant and appellee of Medtronic, Inc. I think Judge Collins' decision below should be affirmed for the following reasons. Each of the four causes of action in plaintiff's original and two proposed amended complaints would indeed create State requirements that would be different from or in addition to the Federal FDA-mandated requirements. And Congress has inserted an express preemption provision. And as Regal says, those claims are preempted, which makes the discussion that you had in the last matter significantly different, because these are mandated requirements and plaintiff failed to plead a parallel claim that might have enabled him to evade that despite three attempts to do so. And the district court didn't abuse its discretion in denying yet another attempt to search for a nonpreemptive cause of action or in converting our motion to dismiss into a Rule 56-F motion. In fact, Judge Collins' decision is consistent with dozens of cases around the country within this circuit involving this product that are cited in our brief. No less than five were decided after the briefing in this case and were the subject of our Rule 28J letter. And then lastly, to the extent that plaintiff is, and I believe he is, attempting to salvage the claim by suggesting that a claim based on an alleged failure to provide certain information to the FDA is barred for a separate independent reason, that being the doctrine of implied preemption under Buckman and the no private right of action statute in 21 U.S.C. section 337. And the concept of parallel claims is really not that new. The Supreme Court dealt with it in Medtronic v. Lohr, and the Regal Court certainly dealt with it. The classic parallel claim has been articulated and often repeated by the example Justice Breyer gave in Lohr, and that is, if you had a device that was federally mandated as a requirement to have a 2-inch wire on it, and you made it and the plaintiff got one with a 1-inch wire, that would not be a preempted claim. You wouldn't have had compliance with the Federal requirement, and the plaintiff would be able to pursue State law, common law damages remedy. So, too, here. If, in fact, Mr. Stengel got a device with a warning that was different from the one the FDA approved and mandated, or got a device that was had a different manufacturing process or a different design, he would have a nonpreempted claim. But that's not what we have here. There is no allegation that he didn't get a device that was actually what the FDA approved. Rather, we have an argument that there was – there should have been a warning about a specific event, granuloma, inflammatory mass, earlier than the one that existed at the time. We don't need to get into factual reference in the device correction. It refers to letters sent to the doctor in 2001, but that's actually not important for the preemption analysis. This is a situation where – and there's cases directly on point. There are two very important pre-regal cases that dealt with this. The first was from the Third Circuit in Horne v. Thoratech, where someone said, after the product was on the market, events had come about, and there should have been a warning change sooner. The Third Circuit said, we should get the FDA's guidance on this. And the FDA said, no, that would impose a requirement that's different from or in addition to it, and that's preempted. In a case very factually similar to this one is the Seventh Circuit's decision in McMullen v. Medtronic. In that case, there was a label, and a new event, a new kind of adverse event involving something called diathermy came about. Medtronic sent out a letter, like the device correction letter, to health care professionals. And then the plaintiff had a surgery and said, if you had sent that out earlier and put that on your warning, this wouldn't have happened to me. The McMullen court said, no, that would create a requirement. And it had a discussion about a code section that the plaintiff put in the second supplemental complaint he proposed in his 21 U.S.C. 814.39, which allows Medtronic to send out letters like this device correction letter that was sent out here. McMullen said, because the manufacturer may do that, that's permissive. If you are saying that we're going to impose a mandatory State court requirement that it should have been sent out earlier, now you're imposing a mandatory requirement that is different from or in addition to the Federal requirement, therefore, it's preempted. Since Regal, same thing. The Eighth Circuit in the Fidelis-Briant case adopted that. And the Northern District of Illinois, in a case called Heisner v. Genzyme, dealt with that specific code set, the red code of regulation, indeed said rejected it. So the Fifth Circuit, Your Honor, yes, the Hughes case. It's not really a split of opinion on at least the express preemption part. And the reason why is, first, it's important to note that Hughes preempted every single one of the plaintiff's traditional product liability claims. What it did, though, is say, I'm going to send back to the district court a cause of action, a proposed cause of action that says failure to report adverse event reports to the FDA. The reason why that wasn't immediately dismissed as preempted is the Fifth Circuit assumed, didn't decide, but assumed that Mississippi State law had an identical regulation which would parallel. In other words, that under Mississippi State law, there was a cause of action for failure to report adverse events to the Federal regulators. Now, whether Mississippi actually has that or not, I don't know, but that is another example of how you could state a parallel claim. So what we know, though, here in Arizona, under Arizona law, that does not exist. And the reason we know that is that there's a case called Plasencia v. Iflow. It happens to involve a pain pump, but not a PMA-approved pain pump. So the issue wasn't preemption, per se, but the plaintiffs attempted to create a cause of action based on alleged failure to comply with Federal regulations. And the Court there said there is no Arizona State law duty to do that, and then ended, cited this Court's decision in Fotomedics, to say that you cannot try to enforce Federal regulations by a private plaintiff. That is in the exclusive realm of the government. And so, and again, this circuit has, and on differing views, so the Fifth Circuit has independent duty that's different than what Arizona law has. The Fifth Circuit did have a different view on Buckman. Frankly, I think the Ninth Circuit's view has followed Buckman with Fotomedics, Cohen v. Dupuy, a number of cases, and that's more consistent with both the Eighth Circuit and the Eleventh Circuit in the Walicki-Gables case. So, and as it relates to that, that's why, while it seems like some courts that there may be different approaches or views, the facts matter and the underlying State law matters. And that's why I don't think we're going to get a uniform, bright-line set of cases in parallel claims cases, because you do have to look at, well, does the State in which State law that applies here, is there a State law cause of action that is identical to the Federal cause of action? That's one of the definitions of a parallel claim. So we know that, or we think it may exist in Hughes. We know it does not exist in Arizona. In addition to the Placencia case, there was a case under the Federal fungicide and insecticide, the FIFRA statute, where someone also tried to make an allegation that failure to comply with that regulatory scheme created a separate cause of action. Like Placencia, the Court said Arizona does not have that, cites photoemetics. And so we know that's why Arizona is different, and that's why you may get differing results in preemption decisions around the country on this issue of parallel claims. The Court in Riley and the Eighth Circuit have said this is a narrow gap to get through. Regal didn't deal with Buckman and 337, but other courts since have done that. And as I think the Riley Court, the District of Minnesota may have stated it first, but it's been repeated now in other cases. And that is that when you add Regal and Buckman together, you have a very narrow gap. And what we see now are people knowing that, pleading, just making allegations of violations and citing code sections and statutes without sort of any basis here. And that's what – and again, Judge Collins gave the plaintiffs three opportunities in this case. And at each time determined that, in fact, you can't – one, another phrase you'll see in the decisions is you can't just encant the magic words and say there was a violation of some kind. There has to be some causal connection to the claims in the case, and here we just don't have that. So, again, I don't believe that there was any abuse of discretion in one of the other cases from the Seventh Circuit. There, the district court didn't allow any amendments. Here, there were two proposed amendments that were considered, referenced in Judge Collins's decision, and he also dealt with the express preemption part as well. So the question that concerned me, it's been almost hornbook law when I was practicing law as a trial lawyer that if the judge moves from a judgment of pleadings to summary judgment, that I get a chance to put in my facts. The district judge didn't allow that here. Now, the district judge may be right or wrong, and I don't know what tests, but why shouldn't – why shouldn't we reverse to allow in a summary judgment context where we're trying to find out is there a fact that's materially in dispute, why don't we allow some type of opportunity to show facts that show a dispute? Well, Your Honor, I think there's two parts to that. One is, under the Federal pleading standard under Twombly and Iqbal, there has to at least be enough to get to the point where you say you're entitled to discovery or you're – and the Court asked plaintiffs in this case, what fact are you trying to unearth that would support your claim? And essentially, plaintiffs keep going back to, you didn't report the adverse events to the FDA. But no matter what discovery you get on that, that's never going to change from a legal perspective how it works. The judgment on the pleadings issue, frankly, has been recognized by one circuit, the Seventh, as the appropriate procedure to do instead of motions to dismiss. The fact of the matter is the Fifth Circuit, while the Fifth Circuit also has Hughes, it also has a case called Funk v. Stryker, which was decided the day after Hughes, doesn't reference Hughes, and upheld preemption on a motion to dismiss. And so motions to dismiss has been a very common approach. Certainly, there are summary judgment motions out there on preemption as well. But if you think about what the ultimate end game is for – what Riegel was, is essentially to say that these claims are going to be preempted, except for this narrow exception. Kennedy, if I understand the logic of Riegel and Buckman, the Supreme Court takes the position that it – although it doesn't talk much about discovery, the reality is just like with Tom Lee and Iqbal and so on, there are claims out there that could be voluminous, and there is a policy decision not to permit discovery to go forward unless it's really clear that you fit in the narrow window or can complete non-conclusory allegations that clearly meet the standards of Iqbal. Is that your understanding? Right, Your Honor. Because the idea is, so if somebody, because there's generally a liberal movement to amend, and you get to do it, and then you say, let's go do discovery, you do two years' worth of discovery, and you get to the same end result after just a heck of a lot of doubt. I gather that Congress, in its wisdom in this situation, wanted to avoid burdening companies that invented these devices and so on from so much litigation expense that they wouldn't take the chance to do that. Is that part of the issue? I think that's a fair assessment, Your Honor, because – and to respond to counsel's point about the broad immunity about this, it's important to understand that this preemption doctrine does not apply to every medical device on the market. This – in the Second Circuit's decision in Riegel talked about that in the year before that decision was made, about 1 to 2 percent of all medical devices on the market had been through PMA approvals. So yes, there are a lot of decisions with Medtronic's name on it. There are a lot of decisions with Stryker's name on it. Both companies happen to make a number of PMA products. The one you just heard happened not to be one of those. Medtronic makes 510K products as well. But the fact of the matter is, while there may seem to be a lot of jurisprudence on it, the number of PMA products that get the benefit of this defense is small. And the reason you get the benefit of the defense is these are the products that are life-sustaining, life-saving, and, frankly, pose the greatest risk. And the Supreme Court in Riegel dealt with that and said that, yes, you know, looking at it from a single plaintiff who's injured's perspective, and of course, everyone would feel terrible for Mr. Stengel and Mr. Felipe and anybody else, as the majority opinion said, that the people who have benefited from these products are not represented here in court. It is a policy decision and a tradeoff. I had a follow-up question I wanted to ask you on additional discovery. On page 41 of your brief, you turn to our circuit to cite the Snowden case, but that was an unpublished disposition. Yes, it was, Your Honor, and my understanding is that it was still ‑‑ they're still citable. I mean, the Carson v. Dupuy is, but I think that position about discovery is actually not really precedential, per se, but whether or not the plaintiff or any other party has asked for it and whether there's a justification for the discovery. Well, yes, but in fact, it's not citable, but ‑‑ and we put that into the opinions. But what did the plaintiff show in this case that he wanted discovery for that would show that there's a material fact in dispute and therefore it's inappropriate to have summary judgment? Well, this is a motion to dismiss, Your Honor, so there was ‑‑ Oh, I thought he ‑‑ I thought it moved over to summary judgment. No, no, Your Honor. Actually, the Court denied the request to treat this as a Rule 56-F motion. The basis of the request was because the Court took judicial notice just of the fact of PMA approval. The courts in this circuit, in other words, say that just taking judicial notice of information that's publicly available doesn't convert it into a 56-F. I got your point. Thank you. Unless my colleagues have any questions, we thank both of you for your very learned argument. This is a very complex area, as you know, and we will do our best to get you a decision promptly. Thank you all for today. Thank you very much, Your Honor. That is our last argued case for the day. The Court stands in adjournment.
judges: Wallace, Noonan, Smith